The declaration was, that the defendants so negligently ran their trains on the railroad track, that six of the plaintiff's cattle were killed, and, subsequently, on the same day, another yearling was killed.
The plaintiff introduced a witness, one Henry, who swore that in August, 1854, being near the line of defendant's railroad, he heard their freight train approaching; that down the road he saw six or eight head of cattle on the railroad track; that they were near a bridge, about a quarter of a mile from the witness; that the train passed the witness, and continued with undiminished speed, so far as he saw, until it reached the cattle, and killed three of plaintiff's cows and three yearlings; that the embankment upon which the cattle were feeding, was from twelve to fifteen feet high, and that cattle could get down its sides but very slowly; that the road was straight at this point, and cattle could be seen on it for one mile ahead; that the cattle were killed about four o'clock in the evening, the train going at ordinary speed. This witness further swore that on the same evening, about dusk, he was on the same embankment, endeavoring to drive from the track another yearling belonging to the plaintiff; that he heard the mail *Page 465 
train coming; that the yearling refused to quit the track on which the train was passing, and was run over; that the yearling could be seen on the track for one quarter of a mile ahead. This witness stated on cross-examination, that about the time when the train passed him towards the cattle first killed, the engineer commenced to blow the whistle of his locomotive, and continued to blow until the train reached them near the bridge; that the embankment was of sand, and cattle were in the habit of passing up and down its side; that the plaintiff's cattle were in the habit of feeding on the railroad, and that those killed, were on the track when he first saw them. He further stated, that in the evening so soon as he left the track on the approach, of the mail train, the engineer commenced to blow the whistle, and so continued to blow until the train reached and killed the yearling.
The plaintiff then introduced one Berry who was an engineer and machinist, and had run a locomotive over defendant's road some eight years before; that the embankment referred to was six or eight feet high; that he thought the freight train could have been stopped in one fourth of a mile; that the whistle was used to drive stock from the road, and was ordinarily sufficient for that purpose; that cattle passed over the embankment without difficulty.
The defendant then introduced as a witness, one James Knight, who swore he was the engineer on the defendant's train, when the cattle first mentioned, were killed; that at, and prior thereto, he was at his station, on the locomotive, and was on the look out for obstructions, as carefully and assiduously us could possibly be done; that he first saw the cows and yearlings about one fourth of a mile off, and immediately commenced blowing the whistle as a signal to put on the breaks, also for the purpose of driving the cattle from the track, and he continued to blow' till they were killed; he supposed the brakemen obeyed his signal as the speed of the train was sensibly diminished; that they were then on a descending grade; that his train was very heavily ladened, and consisted of fifteen cars, and that it was utterly impossible to stop *Page 466 
it before it reached the cattle; that the embankment was about five feet high, with an ordinary sand-slope, and that the cattle could easily pass up and down, and were in the habit of doing so; that it was dangerous to the trains and their hands to run over stock, and they always avoided it as much as possible; but, in this particular instance, he did all he could to avoid the catastrophe. That he had been in this business of running trains and engineering for twenty-five years; that he had heard the testimony ofHenry in relation to the killing of the single yearling in the evening; that according to his experience and judgment in the business, the train, running at ordinary speed, could not have been stopped in one fourth of a mile. The witness said that from the time the train approached the stock first spoken of, he was at the proper place on the engine, some space behind the smoke-stack, but he could see the road on either side of the smoke-stack, though not so readily as if no smoke-stack had been there.
The defendant then introduced Gen. Alexander McRae, who, after qualifying himself as an expert, stated that neither the freight train, nor the mail train could have been stopped within the distance of a quarter of a mile from the point where the cattle were killed on the road, if running as described by the witness, Henry; that there was there a descending grade of thirty feet to the mile.
The counsel for plaintiff insisted that there was negligence in law; that if the jury believed the plaintiff owned the stock, and the same were killed in consequence of the negligence aforesaid, he was entitled to their verdict; and, further, that it was the duty of the company so to have their smokestack located, as not to obstruct the view of their engineer, and located, as the one in question was, it was negligence.
The Judge charged the jury that there was some conflict of testimony, as to the circumstances under which the stock were killed in the day time; that there was some evidence of negligence to go to them on the plaintiff's showing, and if they believed the witnesses in preference to those of the defendant, there was negligence, and if the destruction of the stock was *Page 467 
in consequence of it, then they would render the plaintiff a verdict.
If, however, they believed the witnesses for the defendant, as they had stated the circumstances, there was no negligence, and the defendant would be entitled to their verdict; and, further, that it was not negligence to run engines of ordinary construction, with smoke-stacks in the usual places. As to the killing of the yearling by the mail train, the Court charged the jury, that there was no negligence, and that if the train could not have been stopped within a quarter of a mile from where the animal was, and if the engineer, from the first time the beast was seen, made the usual efforts to stop the train and drive it off the track, and it would not go off, there was not negligence, so as to charge the defendant. Plaintiff excepted.
Verdict for the defendant. Judgment and appeal by the plaintiff.
With respect to the beast killed in the evening by the mail train, which would not be driven off the track by the plaintiff's witness, and could not be scared off by the whistle of the engine, which, it is stated, is usually sufficient for that purpose, there was, unquestionably, no culpable negligence on the part of the servants of the company.
As to the others, the Court thinks the case was properly put to the jury; his Honor, assuming the responsibility of instructing them, that, according to one statement of the facts, made by the witnesses for the plaintiff, there was, in law negligence, and that, according to another statement made by the witnesses for the defendant, there was no negligence, and leaving it to the jury to say, which of those statements was the true one. When the testimony of the first witness is heard by itself, one would be impressed that the killing was not only avoidable, but was wilful and wanton. But when it is *Page 468 
seen that, in truth, as is to be inferred from the verdict, the embankment was only five feet high instead of fifteen, with what is called a sand-slope, that is, a long and gradual one, down which the beasts could easily descend; that, as soon as the cattle were seen, the whistle was sounded to put down the breaks, and also that it was continually blown as an alarm to the cattle, (ordinarily effectual;) that there was a grade of thirty feet to the mile, at the point from which the cattle were seen, to that at which they were standing; and that there was a train of fifteen cars, heavily ladened, so that, although the speed, which was at the ordinary rate, was diminished by the breaks, yet, that the train could not possibly be stopped, the features of the case become entirely changed and the negligence is disapproved. It was said however, that the cattle might have been seen at a distance, which would enable the engineer to stop the engine in time, had his vision not been impeded by the smoke-stack, which is placed on the front of the engine, and that it is, in law, negligence, to use an engine with a chimney so constructed as thus to interrupt the view. But the Court thinks his Honor gave the right answer to that, which was, that the defendant was justified in using an engine of the common construction, with the smoke-stack in the usual place. The truth is, that the part of the engine is necessarily in front to produce the draft, requisite to keep up the heat from the fire made at the other end, and to carry off the smoke and cinders, and the draft is made in proportion to the height of the chimney; so that upon a different construction, the cars would be untenantable, and the engine would not operate to any purpose.
The case turned entirely upon the credit of the witnesses, and the judgment must be affirmed.
PER CURIAM, Judgment affirmed. *Page 469